UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JENNIFER L. WILSON,

    Plaintiff,

v.                        407CV003

O'GRADY-PEYTON INTERNATIONAL (USA),
INC. and AMN HEALTHCARE, INC.,

    Defendants.

## ORDER

## I. INTRODUCTION

Plaintiff Jennifer L. Wilson brings this Title VII-based, pregnancy discrimination case against defendants O'Grady-Peyton International (USA) and AMN Healthcare, Inc. Doc. # 1 (attached Complaint). Defendant AMN Healthcare ("AMN") is a healthcare staffing company and defendant O'Grady-Peyton International (USA) ("OGP") is a division of AMN that recruits nurses internationally for positions in the United States as well as other countries. Doc. # 19 ¶¶ 1-2. Wilson, a former recruiter, raises several pregnancy discrimination theories of recovery, including disparate treatment, disparate impact, retaliation, and hostile work environment. Doc. # 29. Defendants move for summary judgment on all claims. Doc. # 18.

Preliminarily, the Court will address defendants' F.R.Civ.P. 37(c) motion to strike three affidavits that Wilson failed to produce during discovery but now invokes to defeat summary judgment. Doc. # 47. Wilson claims the affidavits are exempted from discovery under F.R.Civ.P. 26(a)(1)(B) because they are only being used for impeachment purposes; alternatively they are attorney work product and therefore exempt from discovery pursuant to F.R.Civ.P. 26(b)(3).

Regardless of how these affidavits are identified, Rule 37(c) does not require that they be stricken if there was substantial justification for the failure to produce or that failure was harmless. F.R.Civ.P. 37(c). While the affidavits were not produced, all three individuals were identified by Wilson as potential witnesses having relevant knowledge to this case. Doc. # 46 at 2.

Wilson also represents that her counsel had advised the defendants prior to litigation that he had statements from former employees of the defendants. *Id.* at 2 n. 2. Plus all of these witnesses were identified during plaintiff's deposition. In that the defendants had ample notice that these individuals had knowledge pertinent to this case, Wilson's failure to produce them was harmless. *See Gutierrez v. AT&T Broadband, LLC,* 382 F.3d 725, 733 (7th Cir. 2004) (no abuse of discretion by district court in refusing to strike affidavits where plaintiffs were on notice that witness had information pertinent to case and had fair opportunity to seek discovery from that witness); *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003) (where witness had been listed as a potential witness for nearly a year and a half before trial, no abuse of discretion in allowing testimony). Accordingly, the defendants' motion to strike the affidavits (doc. # 42) is denied and they will be considered in the facts.

## II. BACKGROUND

Wilson was initially hired in 4/02 by OGP as a processor for its "New Markets Team." Doc. # 19 ¶¶ 3, 5. Marie Malone (the alleged discriminator) was the Vice President of New Markets and Wilson's supervisor. *Id.* ¶ 5. As a processor, Wilson's duties included preparing documents for international recruiting trips, processing paperwork generated during those trips, scheduling times for recruited nurses to

take required exams, assisting with the immigration process, and arranging recruited nurses' travel to the United States. *Id.* ¶ 5. Wilson received excellent reviews as a processor in each annual evaluation. *Id.*, exh. A.

In 4/04, Malone offered Wilson a promotion to the position of recruiter. *Id.* ¶ 14. Recruiters traveled internationally to recruit nurses to come work in the United States. *Id.* at ¶ 15. These trips lasted approximately three weeks. *Id.* ¶ 12. The majority of the nurses that sign contracts with AMN do so on these trips, *id.* ¶ 11, but some nurses were recruited by telephone. Doc. # 24 at 19 (Wilso Depo.). After the nurses sign up, recruiters are still responsible for monitoring these nurses' progress and assisting them in becoming eligible to work in the United States (including passing a nursing exam called the NCLEX). Doc. # 19 ¶ 13; doc. # 24 at 19-20.

A recruiter also performs recruitment activities prior to international trips, including sending out emails with advertisements to nurses and scheduling hotel ballrooms where the nurses are actually interviewed. Doc. # 29-2 at 58 (as numbered by CM/ECF) (Riordan Dec.). Without pre-trip advertising efforts, no nurses would show up for recruitment interviews on the international trips because no advertising is done on the actual trip. Doc. # 31 ¶ 13.

Recruiters received three separate commissions per nurse at distinct stages of the process: (1) $50 when the nurse signs a contract with AMN; (2) $50 when the nurse passes the NCLEX nursing exam; and (3) $50 when the nurse begins work at one of AMN's client's facilities. Doc. # 19 ¶ 16.

When Wilson accepted the recruiter position, it was the first time the New Markets Team employed two recruiters. *Id.* ¶ 14. Previously Colin Riordan was the only recruiter and received all of the commissions from recruited nurses.[1] Doc. # 29-2 at 57. At some point after Wilson became a recruiter, Malone discussed the commission system with her but did not say how recruited nurses would be divided between Wilson and Riordan. Doc. # 19 ¶ 17; doc. # 31 ¶ 17.

Subsequently, Wilson and Riordan approached Malone with the idea of splitting all of the commissions 50/50 regardless of what nurses were assigned to each recruiter. Doc. # 24 at 21. Apparently Wilson and Riordan worked very closely together on all nurses so it would have been difficult to track each commission to a specific recruiter. Doc. # 29-2 at 57 (Riordan Dec.). Malone did not agree with this system initially; she preferred the assignment of individual nurses to each recruiter in order to track the progress of the nurses to that specific recruiter. Doc. # 24 at 21-22. But Malone agreed Wilson and Riordan could split commissions 50/50 so long as they made an agreement in writing every quarter. *Id.* at 21; doc. # 19 ¶¶ 21-22. These agreements also specifically state they are only in effect for the quarter specified. *See* Doc. # 33, exh. 4 and 5.

In 6/04, the New Markets Team went on a recruiting trip to Hong Kong, but Malone asked Wilson to stay at the office in Savannah to keep the business running. Doc. # 24 at 24. Wilson did not like the decision but understood Malone needed someone to run the office. *Id.* But Malone and Wilson did discuss that Wilson would still receive 50% of the commissions on all nurses recruited during that trip even though

---

[1] Malone also signed up nurses while on the recruitment trips but since she was not eligible to receive commissions, all of these nurses were given to Riordan. Doc. # 29-2 at 57.

2

she did not go. *Id.* at 25. Malone specifically told Wilson she would receive these commissions per the agreement she and Riordan signed. *Id.*

Riordan then resigned from the company in 2/05 and Nicky Long was hired in 4/05 to replace him. Doc. # 19 ¶ 27. During Malone's interview of Long, she asked Long if she had any children or if she was planning on having children. Doc. # 31 ¶ 27. Long responded that she was recently married and did not plan on having children for a while. *Id.* Malone then hired Long but she was terminated within her 90 day probationary period and never attended any recruiting trips. Doc. # 19 ¶ 28; doc. # 24 at 33. Wilson and Long never discussed how commissions would be allocated between them because Wilson felt it was Malone's responsibility to do so. Doc. # 19 ¶ 29. But Malone did mention to Long that the previous recruiters had *agreed* to split commissions 50/50. Doc. # 31 ¶ 27. In the end, due to Long's quick termination it was never determined how commissions would be split between the two recruiters. Doc. # 29 at 5.

Wilson then became pregnant. On 4/27/05, after discussing Wilson's annual performance review, Wilson told Malone she was pregnant. Doc. # 19 ¶ 34. Malone responded, "I'm shocked." *Id.* at ¶ 35. Wilson understood this response to mean that Malone was treating her differently due to her pregnancy. *Id.* ¶ 37.

In mid-May, Wilson informed Malone that, due to her pregnancy, she would be unable to travel after 8/27/05 per doctor's orders. *Id.* ¶ 38. Wilson did not know exactly when the next recruitment trip would occur, but stated she knew they sometimes went in August. Doc. # 24 at 39. Wilson then suggested scheduling the recruitment trip in June or July.[2] Doc. # 19 ¶ 40. Malone testified that she believed a June or July recruitment trip would not be beneficial to the company because: (1) they had just had a recruitment trip during the first quarter of the year (Jan. to Mar.); (2) they had an exploratory international trip to Dubai in June already planned; and (3) she believed the time frame was too short from the previous recruitment trip to do another one at the same time as the exploratory trip. Doc. # 33 at 73-75 (Malone Depo.).

Malone responded by suggesting August but Wilson already had a two or three day vacation to Las Vegas planned for the middle of that month, so she could only go up until the beginning of August. Doc. # 24 at 39. Malone asked if she needed to plan the recruitment trip around Wilson. *Id.* More importantly, during this conversation Malone said something to the effect of Wilson "should have thought about her position before planning a family." Doc. # 19 ¶ 45.

From this point forward, Wilson claims Malone treated her negatively and "nit-picked" everything she did daily. *Id.* ¶ 46. Wilson states that Malone began to question things in Wilson's work that she never questioned before.

---

[2] Plaintiff points to the affidavit of Karen Riddle, a former New Markets Team processor. Riddle states that a recruitment trip was originally planned for June or July but Malone then pushed the trip back to September. Doc. # 29-2 at 62. Apparently the plaintiff believes that this is further evidence of discrimination -- *i.e.*, Malone moved the trip back just so that Wilson could not go. This is speculation, however, and Rule 56 does not permit it. For that matter, Wilson's own testimony makes it clear that she had no knowledge of any recruitment trip planned for June. *See* doc. # 24 at 38-41. If such a trip was already contemplated during that time period, it is impossible to believe that Wilson, as the only recruiter at that time, would not have known about it.

3

Doc. # 24 at 43. Three co-workers state that Malone was harder on Wilson after learning Wilson was pregnant. Doc. # 29-2 at 61 (Riddle Aff.); *id.* at 65 (Long Aff.); *id.* at 67 (Mullis Aff.). Malone also told Wilson to set daily goals and email them to her everyday, along with what she actually accomplished for that day. Doc. # 24 at 105-106. Wilson thought this was inappropriate because she already set goals for herself everyday (but previously did not email them to Malone). *Id.* However, Wilson was not the only employee who was required to send Malone such emails. Malone requested that Kelly Boyd (a non-pregnant employee Wilson was training) send the same goal setting and accomplishment emails as well. *Id.* at 106.

Furthermore, Wilson provides virtually no examples of how Malone "nit-picked" or questioned her. *Id.* at 63, 64, 69. Wilson admits that Malone periodically nit-picked her before she became pregnant, but claims the frequency with which it occurred increased greatly after Wilson informed Malone of her pregnancy. *Id.* at 69. Yet, it appears that Wilson was not the only employee who was nit-picked. Other non-pregnant workers complained to Wilson that they believed Malone was a nit-picker and strict. *Id.* at 101. And the only specific instance Wilson points to is an email exchange with Malone where Wilson emailed what she accomplished that day and her goals for the next day. Malone responded that it was great. Then a few days later, Wilson's email, in the same format, "suddenly" was not sufficient. Doc. # 29, exh. B, C. But Riordan, the previous recruiter, complained of similar behavior by Malone when he worked there. Doc. # 24 at 102 ("[Colin] often told me that sometimes [Malone] would tell him to do one thing, and then when he did it, she would tell him that that's not what she wanted him to do originally").

Around mid-June, Malone commented to Wilson that she was working inefficiently and needed to be doing more and thinking ahead. *Id.* at 43. When Wilson stood up, Malone commented on how big Wilson's stomach was and asked if she was already showing. Wilson responded, "Yes." *Id.* Malone then remarked, "Well you shouldn't be showing until you're seven or eight months pregnant." *Id.* Wilson told her she thought she would be in maternity cloths by four or five months and Malone (a former practicing nurse) replied, "No. I remember. I worked in a hospital. You're not supposed to show until you're seven or eight months pregnant." *Id.* at 43-44. Wilson took these comments negatively and a co-worker, Karen Riddle, states that Malone made these comments "with disapproval." *Id.*; doc. # 29-2 at 62.

The next day Malone, visited Wilson's office and said she thought something seemed wrong with her lately, stating that Wilson appeared down and upset. Doc. # 31 ¶ 49. Wilson replied that she was upset about Malone's comments with regard to her pregnancy ("I'm shocked"; think about the position before planning a family; and that Wilson shouldn't be showing yet). Doc. # 19 ¶ 50. Malone said she was joking about the "planning" comment and that she did not know when Wilson should be showing because she had never been pregnant herself. *Id.* ¶ 52. Malone then became angry because she could not believe what Wilson was accusing her of. *Id.* ¶ 53. Wilson thought this was inappropriate and felt Malone was simply trying to shift the guilt back to her. Doc. # 31 ¶ 53.

Also in June, Wilson went on the exploratory trip to Dubai with Malone and some clients. Doc. # 31 ¶ 54. While there, Wilson experienced some bleeding and needed to get

off her feet at times. *Id.* Malone supposedly became frustrated and angry with her when she requested breaks. *Id.* Malone later criticized Wilson when, after standing for ten hours straight at one point, she said she did not feel well enough to go to dinner that night. *Id.* Wilson felt like Malone should have been more sensitive to her troubles.

Ultimately, in the beginning of August, Malone promoted a current employee, Stephanie Childs, to the position of recruiter (at that time, Wilson was the only recruiter in the office, but she could not attend the September recruitment trip). Doc. # 19 ¶ 58. Childs would attend the September recruiting trip. After Malone informed Wilson of this, she asked Malone how the commissions on the September trip would be split. *Id.* ¶ 59. Wilson states she was concerned Childs would not agree to split the commissions with her, *id.* ¶ 64, and Childs confirmed this, stating that she would have never agreed to split the commissions with Wilson because she was not on the trip. Doc. # 34 at 25-26. Unlike with Riordan, Wilson and Childs did not speak and did not work together. *Id.* at 61. Childs understood the commission system to accord 100% of the commissions to the recruiter who signed each nurse. *Id.* at 26.

In response to Wilson's inquiry about the division of the commissions, Malone stated that Childs would receive all of them for nurses who were recruited on that trip because she was actually going on the trip (Childs also got all of the nurses that Malone signed). *Id.* ¶ 65. According to Malone, the policy accorded the commission to the recruiter that signed each new nurse. Then that nurse is assigned to that particular recruiter. That recruiter then has the responsibility of making sure the nurse achieves the next two milestones (passing the nursing exam and starting work) and successful completion means two more commissions for that recruiter. Doc. # 33 at 86. Since Childs would be on the trip, she would sign the nurses to contracts and they would then be assigned to her.

Wilson did not like that Childs would receive all of the commissions, and she did not feel that this result was fair. She had, after all, done most of the recruitment work prior to the trip (sending out emails, setting up hotels and interview sites, making travel arrangements). Doc. # 31 ¶ 66. Childs, in contrast, did none of that work. *Id.* Furthermore, Wilson emphasizes, Childs did not even interview the potential nurses on the trip; she simply signed them up after Malone interviewed them. *Id.* But Wilson admits that when a recruiter goes on an overseas trip "you work significantly more hours" than when in the office. Doc. # 24 at 82.

Malone told Wilson to talk to Human Resources (HR). That department's Linda Koleman responded that "the commissions were paid for the recruiter that signs the nurse onto the program...." Doc. # 24 at 51. Wilson told Koleman that she felt like she was not receiving the commissions because she was pregnant. *Id.*

Wilson then talked with Paul Foster, OGP's president, and complained that she felt like she was not getting the commissions because she was pregnant. *Id.* at 53. Foster responded that maybe she should approach Malone and Childs and try to get an agreement in writing that on the next trip Childs would do the prep work and Wilson would go as the sole recruiter and receive all of the commissions. *Id.* But Wilson never spoke to Childs about splitting commissions; nor did she suggest Foster's idea to either Malone or Childs. *Id.* at 55. Wilson did not feel it was appropriate for her to speak to Childs about it. *Id.* at 55. At the same time,

5

Wilson admits that Malone never approached her and Riordan (the previous recruiter with whom Wilson had the commission-splitting-agreement) about dividing commissions. *Id.* at 55-56. That agreement only came to fruition because Wilson and Riordan discussed it on their own and then approached Malone.

After the recruitment trip, Malone presented Wilson with a Performance Improvement Plan (PIP) citing problems with Wilson's performance in the office while they were on the trip. Doc. # 19 ¶ 70; doc. # 33, exh. 8. This followed an 8/19/05 meeting in which Malone felt Wilson was challenging her direction and stressed to Wilson the need for her to take a leadership role and the importance of meeting NCLEX goals (meaning the number of nurses taking the nursing exam). Doc. # 33, exh. 9. The PIP identified three general problem areas: (1) failing to take the lead; (2) failure to partner with other team members to complete assignments; and (3) insufficient contribution to promote a positive work environment. *Id.* exh. 8. These are all areas where Wilson scored either "Proficient" or "Exceptional" in her previous performance review and received an overall rating of "Proficient."[3] *Id.*, exh. 6.

The PIP also states that while Malone was gone, Wilson "did not monitor all team members and processes." *Id.*, exh. 8. More specifically, the PIP cites Wilson for (1) failing to follow up with a co-employee named "Shekeenah"[4] about "nurse starts"; (2) missing meetings with another co-employee, "Francine," about licensure; and (3) failing to "follow up with Francine's manager when ATTs[5] were delayed resulting in pushing nurses back to [the] following month." *Id.*

According to Malone, the department failed to meet its September budget numbers for both "nurse starts" (*i.e.*, nurses who actually begin work in the United States) and nurses taking the NCLEX nursing exam (because ATTs were not issued in a sufficient amount of time). Doc. # 33 at 57. Before Malone left on the trip, she told Wilson that Wilson was in charge of the department. Doc. # 24 at 104. As the person in charge, Malone felt it was Wilson's responsibility to ensure that the department met its budget that month for "nurse starts" and NCLEX testers. Doc. # 33 at 62. Malone believes that if Wilson had sufficiently monitored Shekeenah, who was in charge of nurse starts, the department would have met its monthly budget numbers for nurses beginning work. *Id.* at 57. Likewise, if Wilson had ensured that the licensure meetings with Francine took place and contacted Francine's manager about the delayed ATTs then the department would have met budget for NCLEX testers. *Id.*

Wilson disputes Malone's proffered explanations. She points out that the New Markets Team failed to meet its budget on other

---

[3] According to AMN's review standards, "Exceptional" means "Considered to be an exceptional performer; consistently displays the expected behaviors and exceeds some of the expected behaviors." "Proficient" means "Considered to be a successful, fully proficient performer; displays most of the expected behavior." Doc. # 33, exh. 6.

[4] Frustratingly, the parties have referenced various employees only by their first or last name; where this has occurred, the Court has noted their name in quotes.

[5] Neither party defines ATT. All the Court can surmise is that ATTs have to be issued in a sufficient amount of time to allow nurses to take the NCLEX exam. Doc. # 33 at 54.

6

occasions and Malone never wrote a PIP for anyone else. *Id.* at 63. Furthermore, Wilson presents one email exchange with Shekeenah following up about nurse starts. Doc. # 29-2 at 84-85. Other emails show that it was Francine who continued to miss meetings and that Wilson tried several times to meet with her about licensure. *Id.* at 87-93. Included within those emails are a couple of exchanges between Wilson and Nicole Adams (to whom Francine reports) indicating that Wilson made Nicole aware of both the information she was seeking from Francine and that Francine had failed to reply. *Id.* at 91-92. So, Wilson contends, she actually did everything that Malone accused her of failing to do.

Wilson also points to the affidavits of three co-workers who state that Wilson continued to perform her duties at a high level and in a professional manner after she became pregnant. Doc. # 29 at 61-69. Meanwhile, two of those same co-workers state that Stephanie Childs, the second recruiter, was not a good employee and did nothing in preparation for the September recruiting trip, yet received all of the commissions for that trip and *never* received a PIP for her sub-standard performance. *Id.* at 63, 67-68. Accordingly, Wilson insists that Malone issued the PIP in an attempt to discriminate against her because she was pregnant and in retaliation for Wilson complaining to HR and OGP's president that she felt Malone was discriminating against her.

The PIP stated that if Wilson failed to improve her performance or take corrective action she could be terminated. Doc. # 33, exh. 8. It also provided her the opportunity to submit a written response to the counseling form. *Id.* Despite Wilson's disagreement with the PIP, she did not file a written response disputing it. Doc. # 19 ¶ 74. About a week later, Wilson went to Malone and told her that she would agree to the PIP, wanted to fix the situation and would work to improve. *Id.* ¶ 75.

However, on 11/21/05 Wilson filed a pregnancy discrimination charge with the Equal Employment Opportunity Commission (EEOC). *Id.* ¶ 79. Shortly thereafter, the defendants offered Wilson the choice to stay at her current position or transfer to the position of Placement Manager at the same hourly rate of pay. *Id.* ¶¶ 79-80. Wilson accepted the transfer and likes her new position. *Id.* ¶¶ 81, 83. But Wilson points to the resulting pay disparity, which she says is acute given the commissions she used to receive as a recruiter. Doc. # 31 ¶ 79.

As of 5/24/07, Lisa Blake was working as the second recruiter with Childs. Doc. # 34 at 62-63. Blake and Childs do not share commissions. Doc. # 33 at 87. There is a complete division between Child's and Blake's nurses, with each one receiving commissions only on the nurses they sign up. *Id.*; doc. # 19 ¶ 85.

### III. ANALYSIS

Under F.R.Civ.P. 56(c), "[t]he district court should only grant summary judgment ... where the record evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003); *see also* Fed.R.Civ.P. 56(c). "In ruling on a Rule 56 motion, the district court may not weigh the evidence or find facts. Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrison*, 323 F.3d at 924.

The Pregnancy Discrimination Act (PDA) amended Title VII to provide that prohibitions on discrimination "because of sex" or "on the basis of sex" include discrimination "on the basis of pregnancy, childbirth, or related medical conditions...." 42 U.S.C. § 2000e(k); *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999). Hence, "women affected by pregnancy ... shall be treated the same for all employment-related purposes...." 42 U.S.C. § 2000e(k).

Wilson raises three pregnancy discrimination claims: (A) the defendants' commission policy resulted in both disparate treatment and disparate impact; (B) the discipline of Wilson by the PIP constituted both disparate treatment and retaliation; and (C) the defendants created a hostile work environment, all in violation of Title VII. Doc. # 29.

## A. The Commission Policy

Title VII allows for two actionable claims: disparate treatment and disparate impact. *Spivey*, 196 F.3d at 1312. Claims for disparate treatment may be proven by either direct or circumstantial evidence. *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999). Wilson raises both direct- and circumstantial-evidence-based disparate *treatment* claims, and brings a disparate *impact* claim with regard to the payment of commissions. Doc. # 29.

Plaintiff first contends that Malone denied her commissions for the September recruiting trip because she was pregnant. Unsurprisingly, the defendants insist that her pregnancy had nothing to do with the decision. She was not entitled to any commissions because she was not on the trip and therefore did not actually sign up any nurses. Since Childs actually signed the nurses up, they became her responsibility and subsequent second and third stage commissions belonged to her as well.

### 1. *Direct Evidence of Disparate Treatment*

Direct evidence in employment discrimination cases is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005) (brackets original). "As [Eleventh Circuit] precedent illustrates, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."[6] *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quotes and cites omitted). The only evidence Wilson references is Malone's statement that Wilson should have thought about her position before planning a family when they discussed the scheduling of a recruiting trip. Doc. # 29 at 11. She says this is direct evidence that she was denied commissions because of her pregnancy.

But Malone's comment was made at least two and half months before any issue arose with the commissions. The statement must also be

---

[6] The plaintiff cites to Judge Tjoflat's "preponderance definition" of direct evidence as the applicable standard. Direct evidence is "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." *Wright*, 187 F.3d at 1293. But the Court agrees with other district courts that have held this "preponderance definition" was mere *obiter dictum* and not the applicable standard the Eleventh Circuit actually applies. *See Copley v. Bax Global, Inc.*, 80 F.Supp.2d 1342, 1348 (S.D.Fla. 2000); *Ferrell v. Masland Carpets, Inc.*, 97 F.Supp.2d 1114, 1122 n. 11 (S.D.Ala. 2000). The correct definition of direct evidence has already been expressed above.

8

read in the context of the situation. Wilson had just told Malone that she would be unable to travel after a certain date due to her pregnancy. Malone then suggested scheduling the trip in August, prior to Wilson's travel cut-off date, so that Wilson could go -- evidencing an effort by Malone to work things out so that Wilson could attend. But Wilson responded that she had a personal vacation scheduled for mid-August and therefore could only take a recruiting trip up to the beginning of August.

The lack of temporal proximity between the statement and the denial of commissions at most allows the comment to raise an inference that the commissions were denied because of Malone's pregnancy. But a factfinder could just as easily infer that at that moment Malone was simply aggravated because her only recruiter at the time would not be able to attend the next recruiting trip. Thus the comment fails to prove discrimination "without inference or presumption." *Morris*, 402 F.3d at 1081.

### 2. *Circumstantial Evidence of Disparate Treatment*

When a disparate treatment claim is based on circumstantial evidence, the Court applies the burden-shifting framework derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Hence, a plaintiff must first establish a *prima facie* case that creates an inference of discrimination. *Id.* at 802. After establishing a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the defendant's actions. *Id.* If a legitimate, nondiscriminatory reason is given, the burden shifts back to the plaintiff to show that the defendant's proffered reason is mere pretext. *Id.* at 803.

A *prima facie* case in this context requires the plaintiff to establish four elements: "(1) she is a member of a group protected by Title VII; (2) she was qualified for the position or benefit sought; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules." *Spivey*, 196 F.3d at 1312. Wilson, as a pregnant woman, was a member of a protected class. But she cannot establish any of the remaining elements of her *prima facie* case.

Wilson mistakenly believes the inquiry is whether she was qualified for her position. Doc. # 29 at 12. This situation does not involve a termination, demotion or lack of promotion where Wilson's job qualifications are at issue. Rather this involves whether or not Wilson was qualified for the benefits sought -- *i.e.*, the commissions. And according to the defendants' policy, she was not. Wilson was not on the trip and did not sign up the nurses so she was not entitled to any first stage commissions on those nurses. In the same light, because she did not sign any nurses, none of them were "her nurses" such that she would be entitled to any second or third stage commissions either.

Similarly, because Wilson was not entitled to any of these commissions per the defendants' policy, it cannot be said that she suffered an adverse effect on her employment. True, Wilson did not receive any commissions for the September recruiting trip, but she was not entitled to them. No evidence purports to show that she would never receive commissions in the future. No threat on her job status was made for not attending the trip.[7]

---

[7] Wilson may argue that the PIP threatened termination. But the PIP came after the trip was over and has nothing to do with Wilson not attending the recruiting trip and not receiving commissions.

9

Most importantly, Wilson cannot show that she suffered from a differential application of the commission policy. Normally a plaintiff must identify a similarly situated person outside of her protected class that received more favorable treatment. *Wilson*, 376 F.3d at 1091. This comparator must be similarly situated "in all relevant respects" and "nearly identical" to the plaintiff. *Id.*

The closest comparator Wilson has is herself. Before she was pregnant, she did not attend a recruiting trip to Hong Kong but still received 50% of the commissions on nurses signed up on that trip. Doc. # 24 at 25. Wilson, while pregnant, did not attend the September recruiting trip and did not receive any of the commissions for nurses recruited on that trip. But pre-pregnant-Wilson is in no way similarly situated to pregnant-Wilson.

At the time of the Hong Kong trip, Wilson had a personal agreement with the other recruiter, Riordan, where they would split commissions 50/50 on all nurses recruited. *Id.* at 21. Wilson's own testimony specifically states that Malone told her she would receive these commissions based on the agreement signed between Wilson and Riordan. *Id.* at 25.

In contrast, it is undisputed that Wilson and Childs did not have any such agreement at the time of the September recruiting trip. *Id.* at 55. Upon hearing the news of Child's promotion to recruiter, Wilson asked Malone how the September recruiting trip commissions would be doled out. *Id.* at 47-48. Wilson also was concerned that Childs would not split the commissions with her. *Id.* From these facts it is evident that Wilson knew a 50/50 split on commissions was not the department's policy. Therefore, Wilson pre-pregnancy is not a similarly situated comparator to pregnant-Wilson.

Another important point is that when Wilson stayed behind on the Hong Kong trip, she did so at the request of Malone because Malone needed her to remain at the office. *Id.* at 24. However, Wilson was unable to go on the September recruiting trip for her own personal medical reasons (her pregnancy). So one situation involved staying behind at a supervisor's direction, while the other involved staying behind for personal reasons. In that there is a significant difference between the two situations, they should not be treated as similar in all significant respects. *See Spivey*, 196 F.3d at 1313 (finding no discrimination and recognizing difference between giving lighter work assignments to employees *injured on the job* while refusing to give lighter work assignments to pregnant employees).

While the lack of a similarly situated comparator may not be fatal in some cases, *see Wilson*, 376 F.3d at 1092, the Court believes it is in the current case. The crux of Wilson's claim is that the commission policy was applied to her in a discriminatory fashion. But the defendants show that the policy as applied to Wilson is the policy they apply today. Doc. # 33 at 87; doc. # 19 ¶ 85. As Wilson can show no similarly situated employee that did not attend a recruiting trip and still received commissions for nurses recruited on that trip per the department's policy, her claim must fail. *See Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (lack of similarly situated comparator fatal to plaintiff's case).

Even if the Court assumed that plaintiff raised an inference of discrimination based on the few remarks Malone made to Wilson regarding her pregnancy, she nevertheless cannot show that the defendants' proffered

explanation is mere pretext. Defendants state that Wilson did not receive the disputed commissions because she was not on the trip and therefore did not actually recruit any of the nurses. Doc. # 43 at 5. Childs was on the trip and actually recruited the nurses, so they were assigned to her and became her responsibility. *Id.* This in fact appears to be how Malone initially preferred the system to function when Wilson and Riordan approached her with their personal agreement. Doc. # 24 at 21-22.

Wilson's arguments in opposition basically reflect a disagreement with the defendants on when the "recruitment" actually occurs. Wilson believes she did over 50% of the work for the September trip by sending out emails to potential recruits and setting up accommodations beforehand. Doc. # 29 at 15. Plus she claims that Childs did not even interview the potential recruits on the trip; all she did was sign them up after Malone interviewed them, so she did not actually recruit anyone. *Id.* at 15-16. Wilson further takes issue with the fact that none of the nurses actually signed up by Malone were assigned to her like Malone used to do in the past when Wilson went on trips[8]; all were assigned to Childs. *Id.* at 16.

But a difference of opinion on how an employer decides to assign commissions is not something the Court oversees. This Court is not a "super personnel department" that questions the wisdom of the defendants' decision to give commissions and assign nurses only to those recruiters who actually go on the recruitment trip. *Wilson*, 376 F.3d at 1092. Such a policy is one that would motivate a reasonable employer. As Wilson admits, a recruiter works significantly more hours on an overseas trip than while in the office. Doc. # 24 at 82. There is nothing legally discriminatory about rewarding those recruiters that actually go on the trip versus those who do not. Wilson cannot rebut this proffered non-discriminatory reason by simply questioning, in her opinion, the fairness or wisdom of that decision. Accordingly, defendants' motion for summary judgment on this claim must be granted.[9]

### 3. *Disparate Impact*

Wilson argues that defendants' commission plan, even if facially neutral, is discriminatory in its impact because it prevents all pregnant employees unable to travel from receiving commissions. Doc. # 29 at 17-18. A *prima facie* case of disparate impact requires two elements: (1) "plaintiff must identify the specific employment practice that allegedly has a disproportionate impact"; and (2) "the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination." *Spivey*, 196 F.3d at 1314.

Assuming that Wilson's disparate impact claim is properly before this Court,[10] she has met the first element. The defendants' policy of only giving commissions to recruiters who

---

[8] Again, Malone was not eligible to receive commissions on nurses so the nurses that she signed up on trips she would split up between the recruiters on the trip.

[9] The Court rejects Wilson's argument that this case should be treated as a mixed motive case. Despite her conclusory assertion, she has not established that her pregnancy was a motivating factor in the decision that she would not receive commissions. This argument is completely without merit.

[10] Defendants insist that this disparate impact claim was not part of Wilson's EEOC charge and therefore should not be considered by this Court. *See Price v. M&H Valve Co.*, 177 Fed.Appx. 1, 14 (11th Cir. 2006). Due to the Court's conclusions *infra*, it is not necessary to address this argument.

11

actually make the overseas trip is the challenged practice. But Wilson fails to provide any statistical evidence that this commission policy disproportionately impacts pregnant employees. The only statistical evidence she offers is herself when she was denied commissions one time. That's not sufficient to show a disproportionate impact on pregnant women. Therefore this claim is dismissed with prejudice.

### B. Disciplinary Action Taken Against Wilson

#### 1. *Disparate Treatment*

In order to establish a *prima facie* case of discrimination, Wilson must show, *inter alia*, that the PIP Malone issued to her constituted an "adverse employment action." *Spivey*, 196 F.3d at 1312; *Wallace v. Georgia Dep't of Transp.*, 212 Fed.Appx. 799, 801 (11th Cir. 2006). Wilson insists it was, because the PIP represented a formal written reprimand that would be placed in her personnel file, and it threatened termination if her performance did not improve. Doc. # 29 at 19.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir. 2001) reminds that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Id.* at 1238. And, "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Id.* at 1239 (cites, quotes and original brackets omitted).

Under *Davis*, then, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment" to constitute an adverse employment action. *Id.* While direct economic consequences are not required, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* Moreover, the Court views whether or not the employer's actions were materially adverse from the standpoint of a reasonable person under the circumstances. *Id.*

The *Davis* court rejected the plaintiff's claim that two job performance memoranda criticizing his recent work were adverse employment actions. *Id.* at 1240. "[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Id.* at 1241. A substantive discrimination claim "rarely may be predicated merely on [an] employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment." *Id.* at 1242. Because the plaintiff there suffered no tangible loss in benefits or promotional opportunities from the memos, and they were not *formal reprimands*, they did not meet the threshold level of substantiality for an adverse employment action. *Id.* at 1242-43.

The instant defendants argue that *Davis* controls this case and thus the PIP is not an adverse employment action. Doc. # 18 at 11. They remind the Court that there is no evidence that Wilson suffered any tangible effect on the terms, conditions, or privileges of her employment. She suffered no loss in benefits or compensation[11] nor was she demoted in any

---

[11] While Wilson would dispute this based on the denial of commissions, the Court already established that Wilson failed to show that the denial of commissions was in any way discriminatory and it certainly did not occur as a result of this PIP.

12

way.

But, as Wilson argues, the PIP is different than the memos involved in *Davis* because this was a *formal reprimand* as opposed to simple counseling memos involved there. Malone, who issued the PIP, even states that this was "discipline" and distinguishes it as more serious than a previous oral counseling session the two had concerning meeting budget goals. Doc. # 33 at 67. The PIP declares that if Wilson did not improve or correct her behaviors then she would be terminated. Doc. # 33, exh. 8.

Because this was a formal reprimand threatening termination, a jury could find it to be an adverse employment action within the meaning of *Davis*. Being one step away from termination significantly changes Wilson's conditions of employment, especially when Wilson presents evidence, as the Court will discuss *infra*, that the PIP was baseless and unwarranted such that she will not know what behaviors to correct in order to save her employment. Under the specific circumstances present, the PIP was an adverse employment action.

The defendants next argue that nevertheless Wilson still cannot produce a similarly situated employee outside her protected class that was treated more favorably. Doc. # 18 at 11. More specifically, they argue that Wilson "fails to identify anyone who engaged in similar conduct [to Wilson's] without being issued a PIP." Doc. # 43 at 8-9.

While this is true, lack of a similarly situated comparator (as defined by the defendants) is not fatal to this claim if there is additional discriminatory evidence. *See Wilson*, 376 F.3d at 1092. Wilson does present evidence that previously Malone knew that Childs, before she was promoted to recruiter, had faked her timesheets and repeatedly received a disruptive number of personal phone calls and personal messages while at work Doc. # 29-2 at 63 (Riddle Aff.). Furthermore, Malone told Riordan that she wanted to fire Childs due to her misbehavior and immaturity level. *Id.* at 59 (Riordan Aff.). Yet, Childs never received a PIP. Nor is there any evidence that she was disciplined in any fashion. It is important to note that Childs was not pregnant at the time.

Malone's testimony also indicates that the underlying basis for issuing the PIP was that the department failed to meet its budget for nurses taking the NCLEX exam and nurse starts in September. Doc. # 33 at 57, 62. Wilson was in charge of the office that month and Malone believed that if Wilson had monitored other people sufficiently and contacted the right people, the department would have met its budget. *Id.* at 57.

Yet, Malone admits that the department had failed to meet their budget in previous months. Too, she had never issued a PIP to anyone else before based on that failure. *Id.* at 62-63. While Malone may have a good reason for this, it is not articulated here. And viewing the evidence in the light most favorable to the plaintiff, the lack of disciplinary action against anyone else is probative of potential discrimination.

Furthermore, Wilson presents evidence that the purported reasons for issuing the PIP, as stated on the written reprimand, are unwarranted. As stated previously, *supra* Part II, the three general areas of concern (lack of initiative, failure to partner with other team members, failure to promote positive work environment), doc. # 33, exh.8, were all areas where Wilson had scored very well in her most

recent (in relation to the PIP) annual review before she was pregnant, *id.* exh. 6. Moving to the specifics, the PIP states she "did not monitor all team members and processes." *Id.* exh. 8. Further explaining that, the PIP declares that Wilson (1) failed to follow up with a co-employee, Shekeenah, about "nurse starts"; (2) missed meetings with another co-employee, Francine, about licensure; and (3) failed to "follow up with Francine's manager when ATTs were delayed resulting in pushing nurses back to [the] following month." *Id.*

But again, Wilson presents evidence in the form of email correspondence that refutes the accusations of the PIP. One shows that Wilson did follow up with Shekeenah about nurse starts. Doc. # 29-2 at 84-85. Other emails show that it was Francine who continued to miss meetings and that Wilson tried several times to meet with her about licensure. *Id.* at 87-93. So it was Francine's fault that the meetings were missed and not through any lack of effort on Wilson's part to make them happen. Further emails show Wilson was in contact with Francine's supervisor, Nicole Adams, about the missed meetings and the information that Wilson needed from Francine. *Id.* at 91-92. Nicole was also aware that Francine had failed to reply and provide the needed information. *Id.* So, Wilson contends, she actually did everything that Malone accused her of failing to do.

Wilson's evidence therefore raises an inference of discrimination with respect to the discipline she received. Defendants still argue that even so, Wilson cannot show that the proffered reasons for issuing the PIP are merely pretext. Doc. # 18 at 11. "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538. Furthermore, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Defendants would like to split hairs and say that Wilson's evidentiary showing discussed above does not contradict the citations in the PIP. They argue that the one email exchange with Shekeenah was not sufficient. Doc. # 43 at 11. And Nicole Adams is not actually Francine's manager, another employee named Ed Skornia is, so Wilson should have gone to Skornia when Nicole Adams proved unhelpful. *Id.* at 10. However, the PIP does not use the term "sufficiently" when referring to the failure to monitor; nor does Ed Skornia's name appear. Doc. # 33, exh. 8. In that vein, the Court will not engage in evidentiary interpretation when ruling on a summary judgment motion. It is sufficient that Wilson's evidence casts doubt on Malone's proffered reasons for issuing the PIP.

Nevertheless, Wilson still must establish the additional element necessary to find pretext -- that discrimination was the real reason. *Brooks*, 446 F.3d at 1163. Wilson never actually makes that argument in this section of her briefs. *See* doc. # 29 at 18-21; doc. # 45 at 5-6. But in another section she does make an argument regarding Malone's overall discriminatory animus towards pregnant women. *See* doc. # 29 at 14. First of all, she points to the three comments Malone made to her about her pregnancy. Only one of these, the comment that Wilson should have thought about her position

before planning a family, truly permits an inference of discrimination.[12] Wilson also points to the fact that Malone, while interviewing Nichole Long, a potential recruiter, asked her when she was planning on having children. Doc. # 31 ¶ 27. Long responded that she intended to wait some time because she only recently married. *Id.* Malone hired Long for the position. This permits an inference that Long's lack of future pregnancy plans factored into Malone's decision to hire her.

These facts, along with the substantial showing that the citations in the PIP were unwarranted, establishes pretext under the circumstances of this case. Defendants' motion for summary judgment on this claim must be denied.[13]

---

[12] No reasonable person could find that Malone's statement "I'm shocked" upon hearing of Wilson's pregnancy was discriminatory. Wilson's preferred characterization of this reaction as "more akin to news of a terminal disease than the anticipated birth of a child" (doc. # 29 at 14) is a strained interpretation of epic proportions. Wilson also insists that Malone's statements about her showing too early were made with "disapproval." But this is ridiculous. A pregnant woman is either showing or she is not. The Court cannot even fathom how a reasonable person would understand such a comment to be made with disapproval.

[13] Defendants' further argue that Wilson must prove that Malone lacked a good faith belief that the PIP criticisms were true. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir. 1999). While this may be a correct statement of law, Wilson's evidence casting doubt on Malone's critiques call into question how Malone could have even formed a good faith belief that Wilson had performed so poorly. A mistaken belief is something the Court will consider, but not an ignorant one. The Court sees no evidence that would give Malone a good faith but mistaken belief that Wilson had failed to perform the specific tasks the PIP accuses her of. Therefore, this argument is without merit.

## 2. *Retaliation*[14]

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally related to the plaintiff's protected activity. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

With respect to the first element, Wilson asserts that she engaged in statutorily protected expression when she complained to someone in Human Resources (HR), along with the president of OGP, that she felt like Malone was discriminating against her due to her pregnancy. Doc. # 24 at 51-54. Her basis for these feelings included Malone's comments to her and the denial of commissions.

Defendants argue that this was not statutorily protected expression because Wilson lacked an objectively reasonable belief that Malone was violating Title VII. Doc. # 43 at 13-14. In order to meet this element, a plaintiff must show she had a "good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). There is an objective and subjective component to this. *Id.* Wilson must

---

[14] Wilson's retaliation claim, despite defendants' contention, is properly before this Court. The Complaint charges that Wilson was discriminated against by an employee evaluation in violation of Title VII. See doc. # 1 ¶ 12. While Wilson could have been more specific, the notice pleading requirements of F.R.Civ.P. 8(a) do not demand her to be.

show that she subjectively believed Malone was engaged in discriminatory practices and that this belief was objectively reasonable. *Id.*

Defendants contend that Wilson's belief that Malone was engaged in discriminatory conduct based on her statements is not objectively reasonable. Doc. # 43 at 13-14. But a plaintiff does not have to show that the complained of conduct was actually an unlawful employment practice. *Little*, 103 F.3d at 960. Here, Malone's comment that Wilson should have thought about her position before planning a family, coupled with the denial of commissions, made it objectively reasonable for Wilson to believe she was being discriminated against (even though the denial of commissions was not actually discriminatory). Therefore Wilson has met the first element.

Wilson next asserts that the adverse employment action element is met as well by the issuance of the PIP. An adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006) (quotes and cite omitted). As discussed in Part III(B)(1) *supra*, the PIP represented a formal reprimand threatening termination. A potentially unwarranted formal disciplinary action that threatens termination certainly might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern*, 126 S.Ct. at 2415.

Wilson insists that the third (causation) element is satisfied here because she made her complaints of discrimination in August, Malone was out of the country from the end of August until October, and very soon after her return she issued the PIP. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Wallace*, 212 Fed.Appx. at 802 (quotes and cite omitted). Furthermore, "close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (quotes and cite omitted).

Malone was aware of the protected conduct because she spoke with both of the individuals to whom Wilson complained. *See* doc. # 33 at 83. Also, under the circumstances of this case there is a close temporal proximity. Even though almost two months went by between Wilson's complaints and the PIP, for at least a month of that time Malone was overseas on a recruiting trip unable to issue a PIP. *Id.* exh. 8. The quickness with which Malone issued it upon her return accompanied by the evidence, as previously discussed in Part III(B)(1) *supra*, that the PIP was unwarranted, establishes a causal connection -- *i.e.*, that they are not wholly unrelated -- between the protected activity and the adverse employment action.

Defendants reiterate their pretext argument from the disparate treatment claim above. *See* Part III(B)(1). For the same reasons discussed there, Wilson has sufficiently shown that the proffered reasons for issuing the PIP are mere pretext. *Id.* Therefore, defendants' motion for summary judgment on this claim is denied.

### C. Hostile Environment

Wilson maintains that Malone's conduct was so severe and pervasive as to create a hostile work environment under Title VII. To establish a hostile work environment claim, a plaintiff must show "the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Cooley v. Great Southern Wood Preserving*, 138 Fed.Appx. 149, 154 (11th Cir. 2005) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

A *prima facie* case requires Wilson to prove that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her pregnancy; (4) such harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and (5) the employer is liable for that environment. *Id.* (quotes and cites omitted).

The main issues here are whether the harassment was sufficiently severe or pervasive and whether the defendants are liable for that environment. The defendants concede the first three elements for purposes of this motion. Doc. # 18 at 12.

Establishing that harassing conduct was sufficiently severe or pervasive requires a plaintiff to meet both a subjective and objective test. *Barrow v. Georgia Pacific Corp.*, 144 Fed.Appx. 54, 56 (11th Cir. 2005) (citing to *Mendoza v. Borden,* 195 F.3d 1238, 1246 (11th Cir.1999)). While the plaintiff may perceive the alleged conduct to be sufficiently severe or pervasive as to alter the terms or conditions of employment, that perception must also be objectively reasonable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*). Objective reasonableness should be considered from the view of a reasonable person under all of the circumstances. *Id.* Courts, when determining "objective severity," look to the following factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

Wilson's hostile environment claim rests on the following: (1) the three pregnancy related comments Malone made to Wilson; (2) Malone "nit-picking" her work, monitoring her and asking for daily goals through email; (3) giving conflicting instructions on how Wilson should report to her; (4) Malone's treatment of Wilson on an exploratory trip when Wilson experienced problems with bleeding due to her pregnancy; (5) the denial of commissions; and (6) the allegedly unwarranted PIP. Doc. # 29 at 23-24.

While Wilson says that she subjectively perceived all of this to be severe and pervasive so as to cause her constant stress and anxiety, that is questionable at best. Wilson presents evidence that her performance level never dropped. Other employees declare the same and state that while pregnant, Wilson "was happier," easy to get along with, and she had a very positive attitude. Doc. # 29-2 at 62, 65. These do not sound like the characteristics of someone suffering from a hostile work environment.

But even assuming Wilson subjectively perceived the harassment to be severe and pervasive, her perception was not objectively reasonable. There were merely three pregnancy related comments, only one of which could reasonably be perceived as derogatory (that Wilson should have thought about her position before planning a family). None of the alleged conduct was physically threatening or

17

humiliating.[15]

While Wilson did not appreciate being monitored by Malone and having to report her daily goals, other non-pregnant employees were subjected to the same treatment. Doc. # 24 at 101-106. Malone's conflicting instructions, nit-picking and strict nature are factors, but Wilson herself testified that other employees complained to her about the same behaviors. *Id.* Nor is this type of behavior sufficiently severe to create a hostile work environment. Again, Wilson claims that her performance never dropped as a result of her pregnancy, so the conduct obviously did not interfere with her work. The denial of commissions was not discriminatory, but was simply the application of a company policy.

The only real damaging evidence Wilson presents is Malone's one comment about thinking of her position before planning a family and the unwarranted PIP. But this is not sufficient, combined with all of the above circumstances, to constitute severe or pervasive harassment as to alter the terms or conditions of employment. *See Cooley*, 138 Fed.Appx. at 154 (not sufficiently severe or pervasive where conduct involved repeated cursing, being assigned inferior older trucks, and being assigned less lucrative jobs); *Mendoza*, 195 F.3d at 1247 (not sufficient where employer made sexual comments, sniffing sounds while looking at her groin area, rubbing her shoulders and hips, and constantly stared at and followed her); *see also id.* at 1246-47 (reviewing numerous cases where worse conduct was found *not* sufficient); *Barrow*, 144 Fed.Appx. at 57-58 (not sufficient where black employee repeatedly called "nigger" and "boy," threatened by a white employee that he would kick his "black ass" among other threats, and subjected to numerous racial symbols including KKK, confederate flags and a noose).

Because Wilson has failed to meet the "sufficiently severe and pervasive harassment" element, there is no need to address the fifth element of the *prima facie* case. Defendants' motion for summary judgment therefore is granted on this claim.

### D. Rule 56(d)

"If a court is unable to render summary judgment upon an entire case and finds that a trial is necessary, it shall if practicable grant summary adjudication for any issues as to which, standing alone, summary judgment would be appropriate. *See* Fed.R.Civ.P. 56(d)." *Airtouch Cellular v. City of El Cajon*, 83 F.Supp.2d 1158, 1163 (C.D.Cal. 2000). *Rivera-Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 747 (1st Cir. 1995) (use it to "narrow the factual issues for trial"). Under Rule 56(d), the Court concludes that the only claims remaining for trial are Wilson's claims for disparate treatment and retaliation, based on the discipline she received in the form of the Performance Improvement Plan.

---

[15] Wilson might believe that Malone's refusal to accommodate her when she needed to rest more and experienced bleeding on the exploratory trip was physically threatening. While this may have been inconsiderate, the PDA does not require an employer to provide any preferential treatment to a pregnant employee. *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1322 (11th Cir. 2000).

## IV. CONCLUSION

Defendants O'Grady-Peyton International (USA) and AMN Healthcare, Inc.'s motion to strike affidavits (doc. # 42) is ***DENIED***. Defendants' motion for summary judgment (doc. # 18) is ***GRANTED*** in part and ***DENIED*** in part.

This __26__ day of March, 2008.


_/s/ B. Avant Edenfield_
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA